# In the United States Court of Federal Claims

No. 13-174C
No. 13-196C
(Filed February 25, 2014)

*************************************
                                    *
**JACQUELINE R. SIMS LLC,**           *
                                    *
              Plaintiff,           *
                                    *
        v.                       *
                                    *
**THE UNITED STATES,**                *
                                    *
              Defendant.          *
                                    *
*************************************

## OPINION AND ORDER

      Plaintiff Jacqueline R Sims LLC, dba JRS Management ("JRS"), filed the first complaint in this case at Civ. No. 13-174 on March 7, 2013.  The second complaint was filed at Civ. No. 13-196 on March 18, 2013.  By Order, these actions were consolidated on May 7, 2013.  Both of these cases are contract actions.

      On June 25, 2013, JRS filed a motion for leave to amend the pleadings and the Court granted the motion.  These amended pleadings appear on the docket as attachments to the motion at Docket Entry 12.[1]  After a brief interlude, the parties indicated their desire to file dispositive motions.  JRS filed two separate summary judgment motions, each directed to one of the contracts at issue.[2]  The Government filed a single motion, requesting summary judgment or dismissal, which applies to both actions.

      For the reasons that follow, JRS's motions are both DENIED and the Government's motion is GRANTED, insofar as it requests summary judgment, and DENIED, as moot, with respect to its argument for dismissal.

---

[1] The Amended Complaints do not contain any exhibits or other attachments.  For this reason, any references in this Opinion to attachments to either complaint are directed to the attachments to the originally-filed complaints.

[2] Both motions are filed together as one large document at Docket No. 17.  The first, entitled "Plaintiff's Motion for Summary Judgment," addresses the Ceramics Contract. The second, entitled "Memorandum in Support of Plaintiff's Motion for Summary Judgment," addresses the Parenting Contract.

## I.     Background

As stated above, this consolidated matter was originally filed as two separate cases.  The claims are distinct in that they address two different contracts, Contract No. DJBP010100000006 (the "Ceramics Contract") and Control No. DJBP010100000005 (the "Parenting Contract") (together, the "Contracts").  The Ceramics Complaint was originally filed at Civ. No. 13-174, while the Parenting Complaint was originally filed at Civ. No. 13-196.  Both contracts were executed by the Bureau of Prisons ("BOP").

### a.  Plaintiff's Legal Theories

Both Complaints contain four counts which are substantially similar: (1) that the BOP exceeded its authority under FAR Subpart 42.15 by preparing past performance evaluations ("PPEs") for JRS's performance under the contracts; (2) that the BOP's preparation of the PPEs constitutes a unilateral change of the contract terms in violation of 52.212-4(c); (3) that the BOP's PPEs were arbitrary and capricious because the BOP negatively evaluated JRS for its failure to perform under unenforceable contracts; and (4) that the BOP breached the implied duty of good faith and fair dealing by producing allegedly inaccurate PPEs.  The Ceramics Complaint includes one additional count, effectively alleging that the BOP affirmatively engaged in bad faith conduct related to the evaluation of JRS's performance under the Ceramics Contract which resulted in JRS losing out on a subsequent government contract.

### b.  The Ceramics Contract

The Ceramics Contract was signed on September 24, 2009, with an effective date of October 1, 2009.  The award was for a single base year plus four option years.  The value of the Ceramics Contract was an estimated $63,180.

The Ceramics Contract required JRS to provide an on-site ceramics instructor to teach classes to inmates at the Federal Prison Camp, Alderson, West Virginia ("FPC").  JRS hired a subcontractor to provide the actual instruction.  In practice, the Government would provide delivery orders or task orders to JRS requesting services, JRS would render service, and then JRS would invoice the Government for payment.

The Ceramics Contract incorporated FAR 52.216-21, Requirements (Oct 1995) Alternate I (Apr 1984).  Paragraph c of this provision states that:

> The estimated quantities are not the total requirements of the Government activity specified in the Schedule, but are estimates of requirements in excess of the quantities that the activity may itself furnish within its own capabilities.  Except as this contract otherwise provides, the Government shall order from the contractor all of that activity's requirements for supplies and services specified in the Schedule that exceed the quantities that the activity may itself furnish within its own capabilities.

2

FAR 52.216-2(c).  The Ceramics Contract also incorporated FAR 52.212-4(c), which provides that "[c]hanges in the terms and conditions of this contract may be made only by written agreement of the parties."

The schedule indicated that JRS was required to provide three sessions per week, each session lasting three hours.  The schedule also reflected that there would be a total of 468 one-hour sessions per year.  The schedule stated that this plan was "flexible."

JRS, by way of its subcontractor, provided services in October and November of 2009 and January of 2010—i.e., three of the first four months of the initial contract term. JRS has been paid in full for all services rendered.  JRS did *not* provide services in December of 2009 or for the period from February 1, 2010 to September 30, 2010. Despite JRS's repeated failure to provide services, the Government exercised the first option period.

On September 9, 2010, the BOP generated a past performance evaluation ("PPE"), which it submitted to JRS for review and comment.  JRS was rated for four criteria: quality of service ("unsatisfactory"), timeliness of performance ("poor"), business relations ("fair") and customer satisfaction ("fair").  *See* Ceramics Compl. at ¶ 36.  The PPE referred to JRS's inability to provide a ceramics instructor during portions of the contract period.  JRS submitted a response to the PPE on October 29, 2010.  The substance of the response was that the quality of the services rendered was good, but it also explained why the subcontractor did not perform.

The contracting officer took JRS's comments into consideration and revised her ratings.  JRS then evidently requested that the revised evaluation be reviewed by the contracting officer's superior because, on December 16, 2010, FPC's chief of acquisitions issued a memorandum concurring with the contracting officer's revised overall rating of fair.  The final evaluation included ratings for JRS's quality of service, timeliness of performance, business relations, and customer satisfaction.  The rating for quality of service appears to be the only change based on the reevaluation: the final rating was changed from "unsatisfactory" to "good."[3]  Under the "timelines of performance" criteria, for which JRS received a final rating of "poor," the contracting officer stated:

A review of the rating period reveals that four task orders were issued beginning October 2009 through September 30, 2010; however,

_____

[3] As stated above, JRS alleges that its original ratings on the four criteria were "unsatisfactory," "poor," "fair," and "fair," respectively.  On reevaluation, the latter three ratings remain unchanged.  However, the quality of service rating was revised to "good," apparently on the basis that the original evaluation considered the entire contract term while the revised evaluation only rated JRS for the periods during which service was actually rendered.  *See* Ceramics Compl. Ex. E at 2 ("Quality of [S]ervice was not rated for the period of time in which service was not rendered.  The overall rating for Quality of Service, limited to the months service was performed, is revised to <u>Good</u>.").

service was not rendered from February 1, 2010 to September 30, 2010.
JRS initially notified BOP that lack of service was due to personal illness
of the contract instructor.  Although, JRS did inform the BOP of the
instructor's illness, such circumstances do not relieve the contractor of
their obligation to provide service under the terms of the contract.
Additionally, we note that service was not rendered as of June 2010
because JRS did not have an employee cleared to enter the institution to
perform service.  Failure to provide service during the last eight months of
the rating period effectively compromised achievement of the contract
requirements resulting in a revised rating of Poor for Timeliness of
Performance for the full rating period.

Ceramics Compl. Ex. E at 2.  JRS's ratings for business relations and customer
satisfaction remained "fair," as in the original evaluation.  The memorandum concluded
with a statement that "[t]hese evaluations may be used to support future award decisions,
and shall be therefore marked 'Source Selection Information.'"  *Id.* at 3.

 While all of this was going on, the BOP sent JRS a cure notice on November 12,
2010.  The notice gave JRS 30 days to provide an instructor for the ceramics classes.
JRS never obtained a replacement instructor.  Therefore, on December 27, 2010, the BOP
terminated JRS for default.  The termination was subsequently converted into a
termination for convenience.

 It is not clear from the record precisely when this occurred, but sometime prior to
February 28, 2012, JRS submitted a bid to provide radiology technologies services at the
Federal Correction Institution in Miami, Florida ("FCI Miami").  On February 28, 2012,
JRS was informed by phone that it had received a negative determination of
responsibility and that the matter had been referred "to the SBA [Small Business
Administration] for a COC [Certification of Competency] determination."  Ceramics
Compl. Ex. F at 1.

 By email dated March 6, 2012, JRS informed FCI Miami that it had contracted
with a subcontractor to provide the requested services.  JRS requested that the FCI
reverse its determination of nonresponsibility, withdraw the COC referral, and award JRS
the contract.  JRS's March 6, 2012 email did not refer to the Ceramics Contract at all.

 On March 27, 2012, JRS submitted a "Contracts Disputes Act Claim" regarding
the December 16, 2010 PPE.  JRS requested equitable adjustment for an alleged
unilateral change in the Ceramics Contract's terms based on the Government's generation
of the PPE without JRS's express consent.  JRS also argued, for the first time, that the
contract was unenforceable as an indefinite delivery/requirements contract (for reasons
which will be discussed below).  JRS argued that the unenforceability of the contract
rendered the BOP's evaluation of JRS's performance erroneous because the evaluation
relied upon JRS's failure to perform when it was not legally obligated to perform at all.

On May 24, 2012, JRS's claim was denied in its entirety.  The contracting officer's decision explained that, while FAR 42.1502(b) described instances when a contracting officer *must* produce a PPE, it did not prohibit contracting officers from producing them in situations not covered by the regulation.  With respect to JRS's unenforceability argument, the contracting officer observed that JRS had failed to raise the issue more than a year before when it first had an opportunity to challenge the PPE ratings and therefore summarily rejected this argument.

On August 15, 2012, JRS submitted a revised claim which presented additional information and documentation but which was otherwise similar to its previous claim.  This claim expanded the scope of JRS's legal arguments from the two grounds expressed in the original claim (unilateral change in the contract's terms and unenforceability) to the additional legal theories which form the basis of the instant litigation: violation of FAR 42.1502, unilateral modification of the contract, breach of the covenant of good faith and fair dealing, unenforceability and bad faith.

On October 12, 2012, the contracting officer summarily rejected JRS's revised claim, finding that "the allegations made stem from the same set of operative facts as, and are substantially the same as, the original claim [JRS] filed on March 27, 2012."  Ceramics Compl. Ex. J.  The contracting officer also concluded that JRS's claims pertaining to the FCI Miami contract were not related to the Ceramics Contract and therefore rejected JRS's arguments relating to the FCI Miami contract.  This litigation followed.

### c.  The Parenting Contract

On August 20, 2009, the parties entered into the Parenting Contract.  The substantive provisions of the Parenting Contract largely mirror those in the Ceramics contract.  The similarities between the two contracts include the inclusion of FAR 52.216-21, Requirements (Oct 1995) Alternate I (Apr 1984) and FAR 52.212-4(c).

The Parenting Contract established an effective date of October 1, 2009, and awarded a base year plus four one year option periods.  The value of the contract was estimated at $81,432.  The general structure of this arrangement mirrors the structure of the Ceramics Contract, save that the classroom subject matter was parenting skills rather than ceramics.  Thus, JRS hired subcontractors to provide the actual instruction, JRS would receive notice of services to be furnished via delivery or task orders, and JRS would invoice the Government after services had been rendered.

JRS, through its subcontractors, provided services for the first year of the contract and the first four months of the first option period.  JRS has been paid in full for all services rendered.  No services were rendered during the last eight months of the first option period, and the Government opted not to exercise the second option period.

The BOP generated PPEs for the base year and the first option period.  Both evaluations were submitted to JRS for review.  JRS submitted a rebuttal, wherein it

countered specific ratings from the evaluation.  On February 24, 2011, JRS was informed that the base year PPE had been reevaluated; JRS received an overall rating of "good" for the base year evaluation.

On March 27, 2012, JRS submitted a "Contracts Disputes Act Claim" regarding the base year and option year PPEs on the Parenting Contract.  Once again, JRS argued that the generation of PPEs amounted to a unilateral change in the terms of the contract and for the first time, argued that the Parenting Contract was legally unenforceable for the same reasons expressed in the Ceramics Contract claim.

From this point, the Parenting Contract and the Ceramics Contract claims followed virtually identical paths.  On the same date as the contracting officer denied JRS's Ceramics Contract claim, May 24, 2012, the contracting officer also denied the Parenting Contract claim.  The contracting officer's reasoning mirrored the reasoning in the Ceramics Contract claim, to include the observation that JRS never raised the issue of enforceability when it first had an opportunity to comment on its ratings.

As with the Ceramics Contract, JRS submitted a second, more detailed claim on August 15, 2012.  Just as the revised Ceramics Contract claim anticipated the legal claims filed in Civ. No. 13-174, the revised Parenting Contract claim anticipates the legal claims filed in Civ. No. 13-196.  The Parenting Complaint mirrors the Ceramics Complaint save that it does not include the affirmative bad faith claim raised with respect to the Ceramics Complaint.

Finally, as with the Ceramics Contract claim, the revised Parenting Contract claim was denied on October 12, 2012.  The contracting officer again found that the arguments raised in the revised claim were substantially the same as those raised in the original Parenting Contract claim.  This litigation followed.

## II.    Standard of Review

Under Rule 56 of the Rules of the Court of Federal Claims, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* RCFC 56(c); *see also Celotex Corp. v. United States*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson*, 477 U.S. at 248.  A fact is only material if it might "affect the outcome of the suit under the governing law."  *Id.*

## III.    Discussion

The Court is faced with opposing motions and the legal standard described above applies equally to all of the pending motions.  However, because the material facts are not in dispute, the Court will address both parties' opposing arguments simultaneously.

In presenting their arguments, the parties have combined a few of the Counts in JRS's complaints into one argument.  To reiterate, both complaints state four counts: (1) that the BOP exceeded its authority to prepare performance evaluations as delineated in FAR Subpart 42.15; (2) that the BOP's preparation of the PPEs amounts to a unilateral change in the terms of the contracts, in violation of the Contracts' express incorporation of FAR 52.212-4(c); (3) that the BOP's evaluations were arbitrary and capricious because JRS received negative evaluations for failing to perform under contracts which were unenforceable; and (4) that the BOP, by preparing the PPEs as if JRS was obligated to perform when JRS claims it was not, breached the implied duty of good faith and fair dealing.  The Ceramics Complaint states a fifth count alleging affirmative bad faith on the BOP's part when the BOP delivered the Ceramics PPE directly to FCI Miami.

The key issue in this case is the enforceability of the contracts.  Unless the contracts are enforceable to some degree, JRS's arguments concerning violation of the FAR in preparing performance evaluations, unilateral change in the contracts, wrongful negative evaluations under the contracts, and the effect of the negative evaluations lack a legal basis.

### a.   The Enforceability of the Contracts

The parties agree that the contracts are both unenforceable as written. Where the parties differ is their view of the degree to which these initially-unenforceable contracts became enforceable due to their conduct. On the one hand, JRS argues that the contracts are enforceable only to the extent that JRS performed. The Government, on the other hand, argues that JRS waived its opportunity to raise this argument or, alternatively, that there was an implied-in-fact contract (actually, two contracts) between the parties.  As the Court understands the Government's position, both arguments result in a contract identical in scope to the original.

The flaw that both parties agree renders the contracts unenforceable as written is that although the contracts purport to be requirements/indefinite quantity contracts, the contracts cannot be requirements contracts because they failed to make JRS the exclusive provider of services, *see Horn v. United States*, 98 Fed. Cl. 500, 504-505 (2011) (Smith, J.) (finding that FAR 52.216-21 (Oct. 1995) Alternate I (Apr. 1984) negates the exclusivity element necessary for a requirements contract), and they cannot be indefinite quantities contracts because they did not specify a guaranteed minimum number of services to be provided.  *See id.* at 505 (an indefinite quantities contract requires an expressly-stated minimum quantity to be enforceable).

JRS's argument for limited enforceability relies on *Willard, Sutherland & Co. v. United States*, 262 U.S. 489 (1923) and the *Horn* case just mentioned.  In both cases, the contract at issue was similar to those now before the Court and, in both cases, the contract was found to be unenforceable as written, but enforceable to the extent to which it was actually performed.  *See Willard*, 262 U.S. at 494 ("While the contract at its inception was not enforceable, it became valid and binding to the extent that it was performed."); *Horn*, 98 Fed. Cl. at 506 (finding that, even though the contract was unenforceable at its

inception, the plaintiff was "nonetheless entitled to payment for services actually ordered by, and performed for, the BOP.") (citing *Willard*, 262 U.S. at 494

The Government's first argument is that JRS cannot even make an argument for limited enforceability, because JRS waived its chance to do so. But all of the cases cited by the Government for this proposition involved a *knowing* waiver of rights under the contract. *See Ling-Temco-Vought, Inc. v. United States*, 201 Ct. Cl. 135, 475 F.2d 630, 637 (1973) ("wherever a contract not already fully performed is continued in spite of a *known* breach, the wronged party cannot avail himself of that excuse); *see also Aleutian Constructors v. United States*, 24 Cl. Ct. 372, 384 (1991) (the Government knew of a breach and did not request remedy). Here, there is no evidence that JRS knew of the unenforceability. It could not therefore waive its right to raise this argument.

The Government's alternate argument that the contracts are implied-in-fact contracts is based on *Howell v. United States*, 51 Fed. Cl. 516 (2002). In *Howell*, the court addressed a set of indefinite quantity contracts which failed to expressly state a guaranteed minimum. Facially, then, the *Howell* contracts resembled the contracts in *Willard* and *Horn*, the cases cited by JRS. Unlike *Willard* and *Horn*, however, the *Howell* contracts were found enforceable. In short, the court's decision was based upon the inclusion of FAR 52.216-22,[4] which necessarily obligated the Government "to order *some* minimum quantity of plaintiff's services." *Howell*, 51 Fed. Cl. at 523 (emphasis in original). The Court merely supplied the specific minimum in contracts which already contained an implicit minimum. *See id.* at 523-24.

The problem with this argument is that the relevant FAR provision for the contracts at issue is FAR 52.216-21, not FAR 52.216-22, as in the *Howell* case. In the Court's view, FAR 52.216-21 does not carry the same implicit minimum as FAR 52.216-22. Instead, FAR 52.216-21 leaves open the possibility that the Government will purchase nothing at all. *See* FAR 52.216-21, Requirements (Oct 1995) Alternate I (Apr 1984) ("Except as this contract otherwise provides, the Government shall order from the Contractor all of that activity's requirements for supplies and services in the Schedule *that exceed the quantities that the activity may furnish within its own capabilities*.") (emphasis added).

*Willard* and *Horn*, on the other hand, are directly applicable: they held that contracts unenforceable at their inception for the same reason as the contracts now before the Court become enforceable to the extent that they are actually performed by the parties. Accordingly, the Court concludes that the contracts were both enforceable to the extent that they were actually performed. Nevertheless, the Court's determination that the contracts are enforceable to some degree does not necessarily lead to JRS's other conclusions.

---

[4] Note that this provision is *not* the same as the provision now before the Court: the contracts-in-suit contain FAR 52.216-21, not 52.216-22.

### b. The Government Did Not Exceed Its Authority Under FAR Subpart 42.15 or Unilaterally Change the Terms of the Contracts

Based on the limited enforceability of the contracts, JRS argues that the BOP's preparation of the PPEs went beyond its authority either under the FAR or the contract itself. In effect, these arguments boil down to two points: (1) the BOP violated FAR Subpart 42.15 by preparing performance evaluations which are not mandated by that FAR provision, and (2) the Government breached the terms of the contract by making a unilateral change.

JRS focuses on FAR 42.1502 (included under FAR Subpart 42.15) in particular. According to JRS, FAR 42.1502 describes the only situations in which a government agency can prepare PPEs (presumably absent contractual authority to do so). The Government argues to the contrary, arguing that FAR 42.1502 only applies to situations in which the government must or must not prepare PPEs. In all other instances, the Government argues, the preparation of PPEs is left to the discretion of the contracting officer.

FAR 42.1502 states:

(a) *General*. Past performance evaluations shall be prepared at least annually and at the time the work under a contract or order is completed. Past performance evaluations are required for contracts and orders for supplies, services, research and development, and contingency operations, including contracts and orders performed inside and outside the United States, with the exception of architect-engineer and construction contracts or orders, which will still be reported into the Architect-Engineer Contract Administration Support System (ACASS) and Construction Contractor Appraisal Support System (CCASS) databases of CPARS. These evaluations are generally for the entity, division, or unit that performed the contract or order. Past performance information shall be entered into CPARS, the Governmentwide evaluation reporting tool for all past performance reports on contracts and orders. Instructions for submitting evaluations into CPARS are available at http://www.cpars.gov/.

(b) *Contracts*. Except as provided in paragraphs (e), (f), and (h) of this section, agencies shall prepare evaluations of contractor performance for each contract (as defined in FAR part 2) that exceeds the simplified acquisition threshold and for each order that exceeds the simplified acquisition threshold. Agencies are required to prepare an evaluation if a modification to the contract causes the dollar amount to exceed the simplified acquisition threshold.

(c) *Orders under multiple-agency contracts*. Agencies shall prepare an evaluation of contractor performance for each order that exceeds the simplified acquisition threshold that is placed under a Federal Supply Schedule contract or placed under a task-order contract or a

delivery-order contract awarded by another agency (*i.e.*, Government wide acquisition contract or multi-agency contract). Agencies placing orders under their own multiple-agency contract shall also prepare evaluations for their own orders. This evaluation shall not consider the requirements under paragraph (g) of this section. Agencies are required to prepare an evaluation if a modification to the order causes the dollar amount to exceed the simplified acquisition threshold.

(d) *Orders under single-agency contracts*. For single-agency task-order and delivery-order contracts, the contracting officer may require performance evaluations for each order in excess of the simplified acquisition threshold when such evaluations would produce more useful past performance information for source selection officials than that contained in the overall contract evaluation (*e.g.*, when the scope of the basic contract is very broad and the nature of individual orders could be significantly different). This evaluation need not consider the requirements under paragraph (g) of this section unless the contracting officer deems it appropriate.

(e) Past performance evaluations shall be prepared for each construction contract of $650,000 or more, and for each construction contract terminated for default regardless of contract value. Past performance evaluations may also be prepared for construction contracts below $650,000.

(f) Past performance evaluations shall be prepared for each architect-engineer services contract of $30,000 or more, and for each architect-engineer services contract that is terminated for default regardless of contract value. Past performance evaluations may also be prepared for architect-engineer services contracts below $30,000.

(g) Past performance evaluations shall include an assessment of contractor performance against, and efforts to achieve, the goals identified in the small business subcontracting plan when the contract includes the clause at 52.219-9, Small Business Subcontracting Plan.

(h) Agencies shall not evaluate performance for contracts awarded under Subpart 8.7.

(i) Agencies shall promptly report other contractor information in accordance with 42.1503(h).

Several parts of this FAR provision inform the Court's conclusion that a contracting officer is given discretion to prepare performance evaluations in those circumstances not expressly described in the FAR.  First, paragraph (a) generally provides that PPEs should be produced annually.  This language is very broad.  Second, Paragraphs (b) through (d) require preparation of PPEs when a contract exceeds a simplified acquisition threshold.  They do not forbid PPEs; they only state requirements for when an evaluation *must* be prepared.  Third, Paragraph (h) expressly states that agencies "shall not" evaluation performance in limited circumstances not relevant here.  This tells the Court that the drafters of the FAR knew how to withhold authority when

they wished to do so.  Finally, Paragraphs (e) and (f) simply require evaluations when construction or architect-engineer services contracts exceed a specified value.

JRS argues that the second sentence in both Paragraphs (e) and (f) somehow indicates the intent to limit the discretion of contracting officers.  Both paragraphs include a statement that "[p]ast performance evaluations may also be prepared for [construction or architect-engineer services] contracts below" the specified value.  To the contrary, the Court reads these two statements as simply affirming the general authority of contracting officers to prepare PPEs on a discretionary basis.  The provisions stand only for the proposition that a contracting officer *must* prepare evaluations when expressly required, but that he otherwise has the discretionary authority to prepare PPEs when not expressly required.  They stand for nothing more.  Thus, by this Court's reading of the FAR, contracting officers have broad discretion in producing evaluations, except in the limited circumstances discussed in FAR 42.1502.

JRS's breach argument is less clear than its FAR argument, but seems to boil down to the argument that the preparation of the PPEs was a unilateral change to the contracts.  This argument is based on two points: (1) the Contracts did not expressly provide for the preparation of evaluations, and (2) the Contracts expressly incorporated FAR 52.212-4, which includes a requirement that any modification to the scope of the contract "may be made only by written agreement of the parties."  FAR 52.212-4(c).  JRS argues that the Government unilaterally modified the Contracts and did not do so in writing, which act constitutes a breach.

As to whether the contract expressly provides for the preparation of evaluations, both contracts state that "[t]he [contracting officer] is responsible, as applicable, for: … evaluating performance."  *See* Ceramics Compl. Ex. A at 9; Parenting Compl. Ex. A at 10.  This is the *only* language in either contract that refers to performance evaluation, and it certainly does not place a duty upon the BOP *not* to prepare the evaluations.  Indeed, it *does* seem to be a provision that expressly provides for preparation of evaluations.

The statement quoted above also disposes of JRS's argument based on the written modification agreement requirement of the FAR.  Once again, the Contracts both provided that the contracting officer could evaluate performance "as applicable."  The Court's discussion of FAR 42.1502 demonstrates that an evaluation in this particular instance is left to the discretion of the contracting officer.  It would then follow that a contracting officer's exercise of that discretion falls within the purview of the Contracts' "as applicable" language.  No modification was necessary for the BOP to evaluation JRS's performance.

### c.  The Government Did Not Breach Any Implied Covenant of Good Faith And Fair Dealing

JRS next argues, with respect to both contracts, that the Government breached an implied covenant of good faith and fair dealing.  For example, JRS claims that the

11

Government's ratings were decreased based on JRS's failure to perform work which it was under no obligation to perform. The Government, of course, argues to the contrary.

The implied duty of good faith and fair dealing "is an implied duty that each party to a contract owes to its contracting partner." *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005). This duty imposes obligations on both parties, including "the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract." *Id.* This implied duty extends to the Government. *Id.*

As the Government observes here, JRS must clear a significant evidentiary hurdle in order to meet its burden. This hurdle comes in the form of the presumption that government officials act in good faith. *See Kalvar Corporation, Inc. v. United States*, 211 Ct. Cl. 192, 543 F.2d 1298, 1301-1302 (1976); *see also Road and Highway Builders, LLC v. United States*, 702 F.3d 1365, 1368 (Fed. Cir. 2012) ("We and our predecessor court, the Court of Claims, have long upheld the principle that government officials are presumed to discharge their duties in good faith."). This presumption may only be overcome by the presentation of clear and convincing evidence that the official did not discharge his or her duty in good faith. *See Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002).

Here, the only evidence before the Court shows that the parties entered into a pair of contracts that, while unenforceable, were not treated as such. JRS argues that the Government's performance evaluations were inaccurate because JRS was not obligated to perform. While it certainly was not obligated to perform under an unenforceable contract, the evidence shows that despite the flaws in the written language of the contracts, the parties intended to be bound. For a period of time, JRS performed exactly as called for in the contracts. *See* Ceramics Compl. at ¶ 25 (JRS performed during October and November of 2009, the first two months of the contract); Parenting Compl. at ¶ 26 (JRS performed for the entire first year of the contract, as well as the first four months of the option year one). The Government paid for all services rendered. After an initial period of performance, JRS suddenly ceased providing services on both contracts.

Even though the contracts were unenforceable as written, this evidence does not demonstrate any bad faith on the Government's part. The parties performed as if their conduct was governed by an enforceable contract: JRS performed and the Government paid. Indeed, after the Government prepared the performance evaluations for both contracts, JRS had the opportunity to comment on the evaluations. JRS did not raise even the specter of unenforceability. From the Court's view, both parties acted as if they were bound by a contract which required that JRS perform certain services whenever the Government requested them.

For these reasons, the Court finds that JRS has failed to demonstrate anything in the Government's actions that breach the implied duty of good faith and fair dealing or otherwise demonstrate that the BOP's evaluations were arbitrary or capricious.

Therefore, the Government is entitled to summary judgment with respect to JRS's implied duty claims.

### d.  The Government Did Not Affirmatively Act in Bad Faith

This particular argument applies only to the Ceramics Contract.  Relying on *Levering & Garrigues Co. v. United States*, 71 Ct.Cl. 739, 757 (1931), JRS argues not that the BOP failed to act in good faith, but that its conduct was so arbitrary and grossly erroneous that it constitutes bad faith.  The Government argues that the contracting officer's actions were in accord with the relevant regulations.

This argument revolves largely around JRS's proposal relating to the FCI Miami solicitation.  Specifically, JRS notes that even though the contracting officer marked the Ceramics PPE as "source selection information," the PPE was never submitted to the Past Performance Information Retrieval System ("PPIRS").  Because the PPE was never submitted to PPIRS, JRS argues that the FCI Miami contracting officer "did not obtain the evaluation by accessing the PPIRS database of her own volition."  Ceramics Mot. at 18.  It appears, based on the pleadings, that the FCI Miami contracting officer received the PPE directly from the FPC officers in West Virginia.  JRS claims that its bid on the FCI Miami solicitation was rejected because of the Ceramics PPE.

The Court returns once again to the presumption of good faith on the part of government officials.  *See Road and Highway Builders*, 702 F.3d at 1368.  The only evidence that JRS has provided in support of this argument is that the FPC contracting officer provided the Ceramics evaluation to the FCI Miami staff.  Thus, JRS has offered no evidence that the contracting officer was acting in bad faith by providing the PPE to FCI Miami.  To the contrary, as the Government argues, the contracting officer's disclosure of the Ceramics evaluation was proper under the FAR.  *See* FAR 9.105-1(d) ("Contracting officers and cognizant contract administration offices that become aware of circumstances casting doubt on a contractor's ability to perform contracts successfully *shall promptly exchange relevant information*.") (emphasis added); *see also* FAR 9.105-1(a) ("Before making a determination of responsibility, the contracting officer *shall possess or obtain information* sufficient to be satisfied that a prospective contractor currently meets the applicable standards in 9.104.").

In addition, the Government briefly touches on a point that this Court finds particularly relevant here.  The Government observes that JRS should have filed a bid protest on the FCI Miami solicitation if it wished to protest the finding of non-responsibility.  The Court agrees on this point, as it appears that the alleged injury which resulted from the alleged bad faith is JRS's failure to receive the FCI Miami award; the alleged actions did not interfere with the performance of the Ceramics Contract in any way.

Again, the record is devoid of any evidence that supports JRS's legal theory.  JRS's failure to meet its evidentiary burden once again leads the Court to conclude that the Government is entitled to summary judgment with respect to JRS's bad faith claim.

13

**IV.     Conclusion**

In sum, the Court finds that the undisputed facts entitle the Government to summary judgment on all counts of both complaints.  Regarding Count I, the Government did not exceed its authority under FAR Subpart 42.15 when it prepared the performance evaluations at issue.  As to Count II, the Government did not unilaterally change the terms of either contract when it prepared the evaluations.  Even though the contracts were unenforceable, the Court does not believe that the evaluations were arbitrary or capricious, as alleged in Count III, because both parties acted for substantial periods of time as if they both intended to be bound by the contracts.  Even when given the opportunity to raise this issue when it was provided with the draft evaluations, JRS failed to do so.  JRS failed to present any evidence that the Government breached the implied duty of good faith and fair dealing, as alleged in Count IV.  Likewise, JRS has failed to present any evidence of bad faith as alleged in Count V of the Ceramics Complaint.

Because the Court has determined that the Government is entitled to summary judgment as to all counts in JRS's two complaints, it does not reach the Government's arguments for dismissal pursuant to RCFC 12(b)(6).

For these reasons, JRS's motions for summary judgment are DENIED and the Government's motion for summary judgment is GRANTED.  The Clerk is directed to enter judgment accordingly.

s/ Edward J. Damich
EDWARD J. DAMICH
Judge